**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In the Matter of the Application of

IOAN MICULA, *et al.*,

       Petitioners,      Case No. 1:15-mc-00107-P1

For Recognition and Enforcement of an
Arbitration Award

      - against –

THE GOVERNMENT OF ROMANIA,

       Respondent.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO VACATE OR STAY JUDGMENT

    Defendant, The Government of Romania ("Romania") respectfully submits this memorandum in support of its motion pursuant to Fed. R. Civ. P. 59(e), 60(b), and 62(b) to vacate and/or stay:

    a) the Order and Judgment signed by this Court on April 21, 2015 ("April 21 Order and Judgment"); and
    b) the Order and Judgment signed this Court on April 28, 2015 ("April 28 Order and Judgment"), amending the April 21 Order and Judgment.

### PRELIMINARY STATEMENT

    On December 11, 2013, in an arbitration conducted at the International Centre for Settlement of Investment Disputes ("ICSID"), concerning a from Romania's introduction and subsequent revocation of certain economic incentives, contained in Emergency Government Ordinance 24/1998 ("EGO 24"), and the alleged damages suffered by Plaintiffs as a result of such revocation, the arbitration tribunal ("Tribunal") issued an award ("Award") in favor of Plaintiffs for the sum of pay RON 367,433,229.  *See* a true and accurate copy of the Award attached hereto as Exhibit 1.

1

On Aril 11, 2015 Viorel, filed in United States District Court for the District of Columbia the District ("DC Court"), a Petition to Confirm Arbitration Award ("D.C. Petition"), case number 1:14-cv-00600(APM). *See* a true and accurate copy of the D.C. Petition to Confirm Arbitration Award attached hereto as Exhibit 2.  Despite the sole filing, his counsel confirmed that he was seeking the recognition and enforcement of the Award for all Claimants.  *See* a true and accurate copy of the D.C. Court transcript from April 16, 2015 attached hereto as Exhibit 3, p. 10, ln. 22-25. On April 16, 2015, the D.C. court denied the Petition ruling that "the enabling statute of the ICSID Convention which is 22. U.S. C. 1650a does not permit the *ex parte* procedure of confirmation of an ICSID award that the petitioner has requested." *See* Exhibit 3, pp. 9-12, and *see* a true and accurate copy of said D.C. Order attached hereto as Exhibit 4.  The Court ruled that in terms of enforcing an award, Plaintiffs "file a plenary action, that is, an action subject to the ordinary requirements of process…which will require them to serve process on the government of Romania". *See* Exhibit 3, p. 21, ln. 1-6.

Despite the D.C. Order, on April 21, 2015 Ioan, European Food, Starmill, and Multipack filed another Petition requesting immediate entry of judgment on the Award on an *ex parte* basis pursuant to 22 U.S.C. § 1650a in the United States District Court , Southern District of New York ("NY Petition").  *See* a true and accurate copy of said NY Petition attached hereto as Exhibit 5.  This Court granted the NY Petition on April 21, 2015 and entered the April 28, 2015 Order and Judgment.  *See* a true and accurate copy of said April 21, 2015 Order and Judgment attached hereto as Exhibit 6.  On April 28, 2015 Viorel filed a Motion to Intervene and to Amend Judgment requesting to intervene and amend the April 21, 2015 Order and Judgment and for immediate entry of judgment on the Award on an *ex parte* basis pursuant to 22 U.S.C. § 1650a. *See* a true and accurate copy of Viorel's Motion to Intervene and to Amend Judgment attached

hereto as Exhibit 7. The Court granted Viorel's petition on April 28, 2015 ("April 28 Order and Judgment").   See a true and accurate copy of the April 28 Amended Order and Judgment attached hereto as Exhibit 8.

Romania now moves to vacate the April 21 Order and Judgment and April 28 Order and Judgment as void pursuant to Fed. R. Civ. P. 60(b) given that (i) there was no service of process on the Romanian government; (ii) federal courts cannot recognize or confirm an ICSID award *ex* parte; (iii) venue is only proper in the District Court of the District of Columbia, where a plenary action must be filed; and (iv) alternatively, the enforcement of the judgment must be stayed because of (a) an ongoing appeal before the ICSID tribunal, (b) the inaccuracy of the amount awarded, (c) order from the European Commission ("Commission") prohibiting Romania to execute the Award, and (d) the precedential effect of the appeal of *Mobil Cerro Negro Ltd, et al. v. Bolivarian Republic of Venezuela* on the use of *ex parte* petitions in cases such as this.

A federal court has no personal jurisdiction in any action against a foreign state, and the state is therefore entitled to jurisdictional immunity, unless and until there has been service of process upon the foreign state in conformity with the service provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(a). Plaintiffs' reliance on provisions of the New York CPLR to obtain an *ex parte* order recognizing the Award not only ignores the exclusive application of the FSIA, but also runs afoul of the specific provisions of the ICSID Convention regarding the recognition of awards, as well as the United States implementing legislation, 22 U.S.C. § 1650a.

Under the ICSID Convention, a Contracting State with a federal system, such as the United States, may treat an ICSID award as if it were a "final judgment of the courts of a constituent state." This provision is carried out in the United States implementing legislation,

which specifically provides that federal courts have exclusive jurisdiction to recognize ICSID awards and that an ICSID award "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). The procedure applicable in United States federal courts for the recognition of state court judgments is the institution of a plenary action, on notice, with appropriate service of process.

Most importantly, Plaintiffs' *ex parte* Petition in DC was denied on this very basis. *See* Exhibit 3, pp. 9-12, and pp.10-15 of the D.C. court's Memorandum Opinion attached hereto as Exhibit 9.  In effect Plaintiffs forum shopped when filing their NY Petition with this Court.

This Court should vacate the April 21 Order and Judgment and April 28 Order and Judgment because venue is improper. Under the exclusive venue provisions of the FSIA, in the absence of any connection to this district or any other U.S. district, venue in an action against a foreign state lies only in the United States District Court for the District of Columbia. Plaintiffs' disregard of this requirement is forum shopping, pure and simple, which the unified recognition scheme set out in 22 U.S.C. § 1650a seeks to discourage and which the venue provisions of the FSIA prohibit. This is especially true in light of the fact that the DC Court issued a ruling expressly denying Plaintiffs' ex parte motion on these ground!  The April 21 Order and Judgment and the April 28, 2015 Order and Judgment do not include any direction as to when the Plaintiffs should give notice to Romania of the entry of judgment or whether Plaintiffs' notice should comply with the service provisions of the FSIA, 28 U.S.C. § 1608(a).

For these reasons, this Court should (a) vacate the April 21 Order and Judgment and April 28 Order and Judgment, (b) reject any further attempts by Plaintiffs to bring an enforcement action in this Court or any other court in the United States , and (d) in the event that

4

this Court denies this Motion, stay any enforcement action of the April 21 Order and Judgment and April 28 Order and Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      The ICSID Arbitration.**

The ICSID arbitration arose from Romania's introduction and subsequent revocation of certain economic incentives, contained in Emergency Government Ordinance 24/1998 ("EGO 24"), for the development of certain disfavored regions of Romania. The Plaintiffs claimed that, in reliance on those incentives, and in reliance on the expectation that these incentives would be maintained during a 10-year period, they made substantial investments in northwestern Romania. The Plaintiffs further claimed that Romania's premature revocation of these incentives was in breach of its obligations under the Agreement Between the Government of the Kingdom of Sweden and the Government of Romania on the Promotion and Reciprocal Protection of Investments (the "BIT" or the "Treaty"), which entered into force on April 1, 2003 and caused damages to the Plaintiffs.

Romania denied that this revocation breached any of its obligations under the BIT. In addition, it argued that this revocation was necessary to comply with European Union's state aid obligations, which in turn was necessary for Romania to complete its accession to the European Union.

On July 20, 2009, the European Commission ("Commission") intervened with an amicus curiae. In its intervention, the Commission explained that the EGO 24 incentives were incompatible with the European Community rules on regional aid. In particular, the incentives did not respect the requirements of Community law as regards eligible costs and aid intensities. Moreover, the facilities constituted operating aid, which is proscribed under regional aid rules. It also argued that "[a]ny ruling reinstating the privileges abolished by Romania, or compensating

the claimants for the loss of these privileges, would lead to the granting of new aid which would not be compatible with the EC Treaty". It also advised the Arbitration Tribunal that the "execution of [any award requiring Romania to re-establish investment schemes which have been found incompatible with the internal market during accession negotiations] can thus not take place if it would contradict the rules of EU State aid policy".

On December 13, 2013 the Tribunal ordered Romania to pay RON 367,433,229 as damages for failing to ensure a fair and equitable treatment of Plaintiffs' investments, thus violating Article 2(3) of the Romania – Sweden Bilateral Investment Treaty. In addition, the Tribunal ordered Romania to pay interest until full payment of the Award.

**B.      Post-ICSID, Collection Action and Litigation.**

On January 2014, Romania had partially implemented the Award by offsetting the damages Romania had been ordered to pay against taxes owed by European Food. The tax debt that that was thus offset amounted to RON 337,492,864. On January 31, 2014, the Commission advised Romanian that any implementation of the Award would constitute new aid and would have to be notified to the Commission. In February 2014, Viorel introduced first the court proceedings in Romania to enforce the Award.  On May 7, 2014, the Commission intervened in those proceedings. On May 28, 2014 Viorel withdrew his action and therefore no judgment has been rendered. On March 18, 2014 the other four claimants (European Food, Starmill, Multipack, and Ioan) initiated court proceedings in Romania to enforce the Award pursuant to Article 54 of the ICSID Convention requesting the payment of 80% of the outstanding amount (i.e. RON 301 146 583) and the corresponding interest.

On March 24, 2014, the Bucharest Tribunal allowed the execution of the Award as requested by the four claimants considering. On March 30, 2014, an executor started the

enforcement procedure by setting the Romanian Ministry of Finance a deadline of 6 months to pay to the four claimants 80% of the Award plus the interests and other costs.   Romania challenged the execution of the Award before the Bucharest Tribunal and asked for a temporary suspension of execution until the case had been decided on the merits. On April 1, 2014, the Commission alerted Romanian to the possibility of issuing a suspension injunction. On April 9, 2014, Romania filed an appeal for the annulment of the Award on the basis of Article 52 of ICSID before an *ad hoc* committee. On May 14, 2014, the Bucharest Court temporarily suspended the execution of the Award until a decision on the merits of Romania's appeal of the Award was granted and granted its request to suspend the execution. On May 26, 2014, the Commission intervened in those proceedings requesting that the Bucharest Tribunal to suspend and annul the execution of the Award. In the alternative, the Commission requested that the Bucharest Court issue a preliminary question to the Court of Justice of the European Union ("CJEU").

The May 26, 2016 Decision also issued an injunction against Romania:

" the Commission therefore finds it is necessary to issue a suspension injunction in accordance with Article 11(1) of the Council Regulation (EC) No 659/1999. The Commission warns Romania that failing to comply with the present suspension injunction; it may refer the matter direct to the Court of Justice pursuant to Article 12 of Regulation No. 659/1999. …The Commission therefore finds it is necessary to issue a suspension injunction in accordance with Article 11(1) of the Council Regulation (EC) No 659/1999. The Commission warns Romania that failing to comply with the present suspension injunction; it may refer the matter direct to the Court of Justice pursuant to Article 12 of Regulation No. 659/1999.    See Page 15, paragraph 57, 58

On August 7, 2014, the *ad hoc* committee of ICSID granted a stay of enforcement of the Award under the condition that Romania deposit, within one month, the following assurances:

"Romania commits itself subject to no conditions whatsoever (including those related to [EU] Law or decisions) to effect the full payment of its pecuniary obligation imposed by the Award in ICSID Case No. ARB/05/20 - and owed to Claimants - to the extent that the Award is not annulled - following the notification of the Decision on annulment.

Romania informed the Commission of such order. The Commission responded to Romania that it could not provide the unconditional commitment that it would pay the

7

compensation awarded under the Award even if that entailed a violation of its obligations under Union law and regardless of any decision of the Commission. Romania replied accordingly to the *ad hoc* committee which lifted the stay of enforcement of the Award as of September 7, 2014. On September 23, 2014, the Bucharest Tribunal, lifted the suspension and rejected Romania's request for a suspension of the execution of the Award. The primary reason for that rejection was the lifting of the stay of enforcement of the Award by the ICSID *ad hoc* committee on 7 September 7, 2014. On September 30, 2014, Romania appealed the September 23, 2014 decision of Bucharest Tribunal.

On October 15, 2014, the Commission submitted an application to the ad hoc committee for leave to intervene as a non-disputing party in the annulment proceedings. Leave to intervene was granted by the *ad hoc* committee on December 4, 2014 and the Commission submitted its amicus curiae brief in those proceedings on January 9, 2015.

On October 17, 2014, the Commission commenced an investigation to open the formal investigation procedure, before the Bucharest Tribunal to determine if the payments made by Romania executing the Award constitute state aid and therefore are illegal. On October 31, 2014 the executor appointed by the Bucharest Tribunal issued orders to seize the accounts of Romania's Ministry of Finance and seek the execution of 80% of the Award. The Ministry of Finance's state treasury and bank accounts were frozen. On November 24, 2014, the Bucharest Tribunal also rejected Romania's main action against the execution orders, including the request for interim measures. On January 14, 2015, Romania appeals the decision of the Bucharest Tribunal.

On February 24, 2015, the Bucharest Court of Appeal lifted the decision of the Bucharest Tribunal of September 23, 2014 and suspended the forced execution until the appeal against the

decision of Bucharest Tribunal of November 24, 2014 is decided. The Commission sought leave to intervene in those appeal proceedings.

On January 5, 2015, the court-appointed executor seized RON 36 484 232 (ca. EUR 8.1 million) from Romania's Ministry of Finance. Of this sum, the executor subsequently transferred RON 34 004 232 (ca. EUR 7.56 million) in equal parts to three of the five claimants, and kept the remainder as compensation for execution costs. Between February 5 and 25 February 2015, the court-appointed executor seized an additional RON 9 197 482 (ca. EUR 2 million) from the Ministry of Finance. On March 9, 2015 the Ministry of Finance voluntarily transferred the remaining amount of RON 472 788 675 (ca. EUR 106.5 million) (including the costs of court appointed executor of RON 6 028 608) onto a blocked account on the name of the five claimants in order to implement the Award. However, the five claimants can withdraw the money only if the Commission decides that the State aid granted on the basis of the Award is compatible with the internal market.

Viorel also initiated further enforcement proceedings against Romania before the Romanian courts on October 3 2014, but that claim was rejected by the Bucharest Tribunal on November 3, 2014.

On March 30, 2015, the Commission issues a final ruling that enforcement of the Award ("Final Commission Decision"), inter alia, as follows:

> -The payment of the compensation awarded by the Tribunal constitutes State aid;
> -Romania shall not pay out any incompatible aid
> -Viorel Micula, Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L., S.C. Multipack, European Drinks S.A., Rieni Drinks S.A., Scandic Distilleries S.A., Transilvania General Import-Export S.R.L., and West Leasing S.R.L shall be jointly liable to repay the State aid received by any one of them.
> -Recovery of the aid referred to in Article 1 shall be immediate and effective.
> -Romania shall ensure that this Decision is implemented within four months following the date of notification of this Decision.
> *See* Exhibit 10 Final Commission Decision on State Aid 38517 (2014/C) (ex 2014/NN),page 40, 41.

**ARGUMENT**

I.   **BECAUSE PLAINTIFFS DID NOT BRING AN ACTION AND SERVE PROCESS IN ACCORDANCE WITH THE FSIA, THIS COURT LACKED JURISDICTION TO ENTER JUDGMENT AGAINST ROMANIA.**

This Court lacked jurisdiction to enter judgment against Romania because Plaintiffs failed to bring an action and serve Romania in accordance with FSIA.

In any action against a foreign state, the state is entitled to sovereign immunity unless the provisions of the FSIA are complied with. 28 U.S.C. §§ 1604, 1330. The only way to establish subject matter and personal jurisdiction is to comply with the FSIA's requirements, including its service of process provisions. 28 U.S.C. §§ 1330(a), (b) and 1608(a); *Argentine Venezuala v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country . . . .").

Without personal and subject matter jurisdiction, a federal court lacks authority to issue a valid judgment. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) ("The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), *quoting Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause."). Moreover, without proper service, this Court lacks authority to adjudicate its own jurisdiction. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment *in personam* resulting from litigation . . . to which he has not been made a party by service of process.").

In an action against a foreign state, service of process is not a mere formality; it is the basis for the Court's jurisdiction. *Texas Trading & Milling Corp. v. Federal Romania of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981) (under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction."), *overruled on other grounds by Frontera Res. Azerbaijan*

*Corp. v. State Oil Co. of Azerbaijan Romania*, 582 F.3d 393 (2d Cir. 2009). *Accord Practical Concepts, Inc. v. Romania of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987). The requirement of serving process upon and establishing personal jurisdiction over a foreign state arises out of the FSIA.

   To this end the FSIA, § 1608(a), provides the exclusive method for serving process on a foreign state. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) ("[S]ection 1608(a) 'sets forth the exclusive procedures for service on a foreign state . . . .'"). Plaintiffs must comply strictly with these requirements. *Id.* at 154 ("We hold that strict adherence to the terms of 1608(a) is required."). Absent proper service, a court lacks jurisdiction to enter judgment against a foreign state. *Id.* at 154 ("The Eastern District of New York lacked personal jurisdiction [over the Romania of Bolivia], and the default judgment registered in the District of Columbia was therefore void and unenforceable."). Thus, the April 21 Order and Judgment is void because Plaintiffs failed to serve process and establish the court's jurisdiction. Fed. R. Civ. P. 60(b); *City of N.Y. v. Mickalis Pawn Shop*, 645 F.3d 114, 138 (2d Cir. 2011) (a judgment is void "if the Court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.").

   Plaintiffs' reliance on *Siag v. The Arab Romania of Egypt*, No. M-82, 2009 WL 1834562 (S.D.N.Y. June 19, 2009), and other uncontested *ex parte* orders issued by the courts in the Southern District is misplaced. Neither *Siag* nor any of those other orders was decided in situations where the sovereign had appeared and presented any arguments at all, and only the *Siag* court provided any reasoning for its decision. In fact, the only court to have heard both sides of the issue, the Eastern District of Virginia, ruled in favor of the foreign state and held that the proper procedure for enforcing an ICSID award in federal court is to bring a new and distinct

action on the award with its attendant requisites of service of process, jurisdiction and venue. *See*, *Cont'l Cas. Co. v. Argentine Republic*, 893 F. Supp. 2d 747, 748 (E.D. Va. 2012).

## II.  FEDERAL COURTS MAY NOT "RECOGNIZE" AN ICSID AWARD *EX PARTE*

### A.  Federal Law Treats ICSID Awards as State Court Judgments, Requiring the Institution of a Plenary Action to Recognize Them in Federal Court.

Unlike judgments of a federal court, which may be recognized *ex parte* by registration pursuant to 28 U.S.C. § 1963, recognition and enforcement of a state court judgment in federal court require the commencement of a plenary action. *Caruso v. Perlow*, 440 F. Supp. 2d 117, 119 (D. Conn. 2006) ("[T]he holder of a state-court judgment seeking to have it enforced in federal court must fall back on the traditional, if rather cumbersome, strategy of bringing a civil action on the state-court judgment by invoking, for example, the diversity jurisdiction of the federal court."). The same procedure applies to an ICSID award.

The question of the proper procedure for recognition of an ICSID award was squarely faced by the court in *Cont'l Cas. Co. v. Argentine Romania*, 893 F. Supp. 2d 747 (E.D. Va. 2012). This is the only case revealed by research in which a United States district court has undertaken an analysis of this issue with the benefit of arguments from counsel for the foreign state defendant. The court analyzed in detail both the ICSID Convention and the well settled procedures for enforcing state court judgments in federal courts. First, the court confirmed that state court judgments are excluded from *ex parte* registration under 28 U.S.C. § 1963. *Id.* at 753 ("Although 28 U.SC. § 1963 provides for the registration of other federal district court judgments, there is no parallel provision for state court judgments."). Similarly, it concluded that enforcement of an ICSID award cannot proceed by *ex parte* registration, but rather must follow the same necessary steps to enforce a state court judgment, *i.e.*, the commencement of a plenary

action. *Id.* at 754 ("Congress mandated that the proper method of enforcement of an ICSID arbitral award is the same as enforcement of a state court judgment, which is a suit on the judgment as a debt.").

The context for this ruling was Argentina's challenge to Continental's choice of venue, as there was no challenge to the method of service. Continental argued that it could bring its petition in any jurisdiction without regard to venue because it was seeking "merely recognition or confirmation," not "enforcement," of the award. *Id.* at 752. The court rejected the notion that federal courts can simply recognize or confirm an ICSID award as an initial step to enforcement, concluding instead that "there is no warrant for distinguishing between recognition, or confirmation on the one hand, and enforcement on the other." *Id.* ("The implementing statute for the ICSID Convention recognizes no such distinction and provides only for the enforcement of ICSID awards.").

Furthermore, the court found that the reference to full faith and credit in § 1650a(a) does not authorize a federal court to treat a state court judgment as if it were a federal court judgment: "[G]iving a state's judgment full faith and credit . . . is a far cry from making a judgment of a state court a federal judgment . . . ." *Cont'l Cas.,* 893 F. Supp. 2d at 753, *quoting W.S. Frey Co. v. Precipitation Associates of Am., Inc.*, 899 F. Supp. 1527, 1528 (W.D. Va. 1995). The effect of this ruling was to subject ICSID enforcement proceedings to the same procedural rules that apply to any other action against a foreign state, including the FSIA's jurisdictional and venue requirements. *Cont'l Cas.,* 893 F. Supp. 2d at 748.

In sum, neither 22 U.S.C. § 1650a nor 28 U.S.C. § 1963 authorizes the recognition of an ICSID award as a judgment of this Court on an *ex parte* basis. On the contrary, by limiting *ex parte* registration in federal court to the judgments of other federal courts under the federal

registration statute, Congress left undisturbed the traditional mechanism for enforcing state court judgments in the U.S. District Courts. *W.S. Frey Co.,* 899 F. Supp. at 1529 ("Congress has not seen fit to grant the courts of the United States authority to do what petitioner asks [*i.e.*, register a state court judgment *ex parte*], and neither statutory nor constitutional full faith and credit affords a substitute for such authority."). Absent any federal authority, a state registration statute such as Article 54 of the CPLR does not authorize *ex parte* recognition of state court judgments in federal court. *Caruso*, 440 F. Supp. 2d at 119 ("[A] federal court has no authority to borrow Connecticut's registration shortcut [*i.e.*, Connecticut's version of CPLR Article 54] for foreign state-court judgments and use that state procedure in place of the federal shortcut provided by Congress [*i.e.*, 28 U.S.C. § 1963]."). Thus, Congress' decision to equate an ICSID award to a state court judgment, instead of a federal court judgment, represented a conscious policy decision *not* to provide for *ex parte* recognition of ICSID awards.

**B. The *Ex Parte* Procedure for Enforcement of ICSID Awards Adopted by Some Courts in the Southern District of New York Is Inconsistent with 22 U.S.C. § 1650a, 28 U.S.C. § 1963 and the FSIA.**

In the Petition, plaintiffs rely on *Siag v. Egypt* and other orders entered in this Court's Motion Term, Part I, that have recognized ICSID awards *ex parte* by applying the CPLR's registration procedures. All of those orders have been entered without opposition from the ICSID award debtors and, with exception of *Siag*, without any opinion or analysis of the Court. *See, e.g., Enron Corp. & Ponderosa Assets, L.P. v. Argentina*, No. M-82 (S.D.N.Y., Nov. 19, 2007); *Sempra Energy Int'l v. Argentina*, No. M-82 (S.D.N.Y., Nov. 15, 2007).

The opinion in *Siag v. Egypt* was issued without an appearance or briefing by counsel for Egypt. In permitting *ex parte* registration of the ICSID award, the court focused on the fact that the award creditors sought only "entry of judgment" rather than "execution of an existing

14

judgment" or attachment of assets. *Siag*, 2009 WL 1834562 at 1. In deciding to apply New York's CPLR, the court cited *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987). But the issue in *Keeton* was whether Article 54 of the CPLR could be used in state court to recognize a federal court judgment rendered in another state. *Keeton*, at 860. There, the Article 54 proceeding was commenced in New York state court and then removed to federal court. The entire decision was about the propriety of state legislation regarding the recognition of federal judgments. The case simply has nothing to do with the issue of whether Article 54 can be used in a federal court to achieve the recognition of a state court judgment in lieu of the ordinary procedure in federal courts regarding the recognition of state court judgments.

By disregarding the explicit statutory directives of 22 U.S.C. § 1650a that ICSID awards are to be treated by the federal courts like state court judgments for recognition purposes and adopting the *Siag* approach, this Court has put the Award on a more favorable footing than it would a state court judgment. For example, if Plaintiffs had tried to recognize a Connecticut *state court* judgment in this Court using the CPLR's *ex parte* registration statute, this Court would have rejected the petition outright because federal law limits *ex parte* registration to the judgments of other federal courts only. Yet, that is exactly what Plaintiffs asked this Court to do with the ICSID Award.

Furthermore, the outcome of *Siag*'s approach is untenable, because it would have federal courts across the country look to a patchwork of state rules to enforce ICSID awards instead of relying on the consistent federal approach. The establishment of a uniform set of procedures for the enforcement of ICSID awards across all federal courts throughout the country also has the beneficial effect of discouraging the type of forum shopping engaged in by the Plaintiffs here. As set forth below in section III, the exclusive venue provision of the FSIA, 28 U.S.C. § 1391(f),

requires Plaintiffs to commence this proceeding in the United States District Court for the District of Columbia. Plaintiffs' blatant disregard of that statute can only be attributed to the fact that, as far as research has revealed, the Southern District of New York is the only court in the country to have adopted the *ex parte* procedure used by Plaintiffs in recognizing ICSID awards. That forum shopping, which is clearly in contravention of the explicit language of the statutes and public policy, should not be rewarded.

In sum, the only method for enforcing an ICSID award in federal court is to follow the same procedure for enforcing a state court judgment, *i.e.*, commencing a plenary action on the award as a debt.

### C. The Convention's Preparatory Works and the Implementing Statute's Legislative History Make Clear that ICSID Awards Are Not Automatically Recognized in the United States, But that an Action Must Be Brought to Convert the Award into an Enforceable Federal Judgment.

The legislative history of 22 U.S.C. § 1650a, supported by the ICSID Convention's preparatory works, confirms the intent of the U.S. Government and Congress that enforcement of an ICSID award must be done through the institution of a plenary action, as opposed to an "automatic" *ex parte* proceeding that is purely clerical in nature.

As set forth above, the second sentence in Article 54(1) of the ICSID Convention, which provides for a *sui generis* enforcement regime for Contracting States with a federal system, was added to the Convention at the insistence of the United States. Combined later with 22 U.S.C. § 1650a, it effectively denied ICSID awards automatic recognition in the United States and instead, required the institution of an action on the award in the same way one has to bring a plenary action on the judgment to enforce a state court judgment in federal court. At the Congressional hearing to ratify the Convention, Fred Smith, general counsel of the U.S. Treasury, explained:

> To give full faith and credit to an [ICSID] arbitral award as if it were a final judgment of a court of one of the several states means that an action would have to be brought on an award in a United States District court just as an action would have to be brought in a United States District court to enforce the final judgment of a state court. Hearing of the House Subcomm., 89th Cong., 2d Sess. 4 (1966) (statement by Fred Smith, General Counsel of the U.S. Treasury) (emphasis added).

If Congress had wanted to provide for automatic recognition of ICSID awards, it could have easily done so by equating awards to federal judgments, thereby extending *ex parte* registration to ICSID awards under 28 U.S.C. § 1963, which had been enacted in 1948 long before ratification of the ICSID Convention. However, Congress has never adopted that approach. Instead, its objective was to establish a uniform procedure for entering judgment on an ICSID award across all federal courts, *i.e.*, commencing an action with its attendant requisites of service of process and jurisdiction as required for enforcing a state court judgment in federal court.

## III.  VENUE IS PROPER IN WASINGTON D.C. AND PLAINTIFFS MUST FILE A PLENARY ACTION TO CONFIRM AN ARBITRATION AWARD.

### A.  Venue is Only Proper in The District Court of D.C.

In any action against a foreign state, the plaintiff must lay venue in accordance with the FSIA's venue provision, 28 U.S.C. § 1391(f), which provides that venue is proper only in the United States District Court for the District of Columbia unless a "substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in another district. *See Commissions Imp. Exp. S.A. v. Republic of the Congo*, No. 11-cv-6176, 2012 WL 1468486 (S.D.N.Y. Apr. 27, 2012) (finding improper venue and transferring enforcement action to the District of Columbia pursuant to § 1391(f), because the underlying claim had no connection to the Southern District of New York). The same requirement applies in an action to enforce an ICSID award. *Continental*, 893 F. Supp. 2d at 748. As stated previously in Section I, a plenary suit is the only avenue for Petitioners to bring their action. *Id.*; 22 USC §1650(a). Furthermore, since a plenary action must be brought, 28 USC

§1391(f) also applies since the action would be a "civil action against a foreign stated." *Id.*; 28 USC §1391(f).

Under Section §1391(f), venue is only proper in a district where the underlying dispute is located or in the United States District Court of D.C. 28 USC §1391(f). Much like *Continental*, this case involves the confirmation of an ICSID award. Because the Award takes on the appearance of a state court judgment via 22 USC §1650a, the Award must be brought pursuant to Section §1391(f). No connections exist with this District. The parties are foreign, the arbitration hearings were conducted in Paris, and all the property at issue in the underlying dispute was located in Venezuela. Thus, the Southern District of New York is an improper venue for this petition.

### B.  Claimants Have Already Attempted to File an Ex Parte Petition in D.C., Which Was Denied.

As stated before (*infra* p. 2), the D.C. Court denied Plaintiffs' *ex parte* Petition seeking to have the Award recognized and enforced, ruling that *ex parte* Petitions in this context are impermissible. Despite this, Plaintiffs filed the *ex parte* NY Petition on April 21, 2015.

On May 18, 2015, the D.C. issued a written ruling, the D.C. Order in which the D.C. Court analyzed this Court's many *ex parte*  rulings, including its recent ruling in *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 14 CIV. 8163 PAE, 2015 WL 631409 (S.D.N.Y. Feb. 13, 2015). *See* Exhibit 9, p. 8. It found that the analysis of this Court was incorrect and that the court in *Continental* was consistent with the text and structure of the ICSID Convention and 22 USC §1650a. Exhibit 9, p. 10. The court held that clearly the text of Section 1650a requires ISCID awards to be treated as state judgments. *Id.* The enforcement through a plenary action is the only proper treatment of a state judgment by a federal court. *Id.* The court provides a thorough analysis of the multitude of reasons for requiring a plenary action in dealing with an

ICSID award, which is a recitation of its analysis at the telephonic hearing. *See*, Exhibit 9, p. 10-13; Exhibit 3, pp. 12-26.

Assessing the timeline, familial and corporate relationships of the parties, and the fact that Plaintiffs have clearly engaged in forum shopping in an effort to take advantage of favorable *ex parte* proceedings and prejudice Romania from having adequate time to find counsel and respond.

## IV.   THIS COURT MUST STAY ENFORCEMENT OF THE JUDGMENT WHILE APPEAL OF THE AWARD IS PENDING.

Romania seeks to vacate the April 21 Order and Judgment and April 28 Order and Judgment.  It also, seeks a stay said orders during the pendency of this Motion and until the appeal on the Award is finalized.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co*., 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). "[T]he decision whether to issue a stay is [therefore] 'firmly within a district court's discretion.' " *LaSala v. Needham & Co., Inc.,* 399 F.Supp.2d 421, 427 (S.D.N.Y.2005) (quoting *Am. Shipping Line v. Massan Shipping*, 885 F.Supp. 499, 502 (S.D.N.Y.1995)).

### A. This Court Must Stay Enforcement Because An Appeal is Pending with the ICSID Tribunal.

On April 9, 2014, Romania filed an appeal for annulment of the Award on the basis of Article 52 of ICSID before an *ad hoc* committee. *See* Romania's Reply on Annulment attached hereto as Exhibit 11.  The basis of Romania's and the Commission's annulment/appeal of the Award is, inter alia, that the Award is unenforceable. *See* Exhibit 11. The arguments filed by all parties on appeal are complex, elaborate and involve extensive legal analysis, which are beyond the scope of this court.

Without elaborating on the extensive laws, treaties and regulations cited by all parties in the appeal, Romania argues on appeal, that the Award constitutes impermissible State aid. *See* Exhibit 11, ¶85 . It also argues that paying any such compensation would place Romania in breach of its obligations under European law, hence the Award is unenforceable. *See* Reply page 85. The Commission makes the same argument on appeal.  Written Submission Pursuant to Articles 37(2) and 53 of the ICSID Arbitration Rules Romania's. It argues that the Tribunal failed to consider, inter alia, the European State aid law. *See Id* a p 6. Had it done so, it would have been able to see an inherent conflict between exiting treaties and would have been unable to render the Award. Id. Moreover, it would also have seen that the Award constitutes unlawful Id. Paragraph 44.

Also as evidenced by the multiple lawsuits in Romania and appeals related to such, the issue of validity of the enforcement of the Award is not only in dispute, but subject to conflicting rulings.  Any ruling to permitting the execution of the Award creates an additional layer of confusion and conflict in this matter.

This Court has recently recognized that staying the enforcement of an award is the prudent solution when there is pending appeals or discrepancies in the award amount. *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 14 CIV. 8163 PAE, 2015 WL 631409, at *24 (S.D.N.Y. Feb. 13, 2015). Many international courts and entities are involved in these proceedings abroad. Since the petitioners could seek attachment of more than the sum total assets, this court must stay enforcement pending resolution of the ICSID tribunal appeal.

### B. The Enforcement Is Inappropriate Because The Amount of the Award is Inaccurate and In Dispute.

The Award amount is incorrect and in dispute.  The following issues which are on appeal make the enforcement of the Award create an extreme prejudice to Romania.  Beyond a

prejudice to Romania, it would result in a benefit to Plaintiffs, where they would have overpayment, double payment or payment to which they are not entitled.

First, the Tribunal issued a "collective award" to the Plaintiffs. As evidenced on the appeal, the Tribunal's "collective award" did not provide an accounting of the damages. First, the Award was calculated using the damages from six (6) companies that were not party to the ICSID arbitration. *See*, Exhibit 11, ¶130. This has grossly inflated the award amount beyond what it would be had the damages been limited to just the parties to the ICSID arbitration. *Id*. The tribunal held that the non-party companies could not recover for their losses, but the tribunal still added their damages into the ICSID Award. Given that it is unclear if the appeal will exclude the amounts for the non-claimants, executing the Award for the amount of the April 21 Order and Judgment and the April 28 Order and Judgment, will result in an unfair windfall to Plaintiffs.

Second, the April 21 Order and Judgment and the April 28 Order and Judgment do not reflect any offsets to the Award. On January 2014, Romania had partially implemented the Award by offsetting the damages Romania had been ordered to pay against taxes owed by European Food. The tax debt that that was thus offset amounted to RON 337,492,864. *See*, Exhibit 11, ¶135. The Award being executed without offsets creates a windfall to Plaintiffs.

Third, Romania has executed the Award, but has been ordered by the Commission to recoup the amounts advanced to Plaintiffs. The fact that the Commission has intervened is a third party action independent of Romania.

Fourth, there is a direct order prohibiting Romania from enforcing the Award. The Final Commission Decision of March 30, 2015, is clear that Romania is prohibited from enforcing the Award, as the execution of such constitutes state aid. Beyond that Romania has been ordered by

the Commission to recoup any of the funds that it has advanced within four months of the issuance of the Final Commission Decision.

### C. This Court Must Stay Enforcement Because an Appeal is Pending with the 2nd Circuit that will Directly Impact this Case.

The case of *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela* is a case on point with this case ruled that staying the enforcement of an award is the prudent solution when there are pending appeals or discrepancies in the award amount. *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 14 CIV. 8163 PAE, 2015 WL 631409, at *24 (S.D.N.Y. Feb. 13, 2015). The facts are almost duplicate in both cases. Both involve a petitioner bringing an *ex parte* motion to confirm an ICSID Award. Both Venezuela in that case and Romania in this case present arguments against the use of *ex parte* procedures to confirm such awards. The law and arguments used, outside of the recent D.C. opinion, are nearly identical, and as such, will be impacted by decision of the 2nd Circuit Court of Appeals in *Mobil*. *See*, *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 2nd Circuit Court of Appeals, Docket No. 15-0707.

For the sake of judicial economy and to prevent further appeals and remands, this Court should stay enforcement of the judgment pending the resolution of *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 2nd Circuit Court of Appeals, Docket No. 15-0707.

This Court has recently recognized that staying the enforcement of an award is the prudent solution when there are pending appeals or discrepancies in the award amount. *Mobil* 14 CIV. 8163 PAE, 2015 WL 631409, at *24 (S.D.N.Y. Feb. 13, 2015). Many international courts and entities are involved in these proceedings abroad. Since the petitioners could seek attachment of more than the sum total assets, this court must stay enforcement pending resolution of the ICSID tribunal appeal.

**CONCLUSION**

22

A federal court has no personal jurisdiction in any action against a foreign state, and the state is therefore entitled to jurisdictional immunity, unless and until there has been service of process upon the foreign state in conformity with the service provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(a). Plaintiffs' reliance on provisions of the New York CPLR to obtain an *ex parte* order recognizing the Award not only ignores the exclusive application of the FSIA, but also runs afoul of the specific provisions of the ICSID Convention regarding the recognition of awards, as well as the United States implementing legislation, 22 U.S.C. § 1650a.

Under the ICSID Convention, a Contracting State with a federal system, such as the United States, may treat an ICSID award as if it were a "final judgment of the courts of a constituent state." This provision is carried out in the United States implementing legislation, which specifically provides that federal courts have exclusive jurisdiction to recognize ICSID awards and that an ICSID award "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). The procedure applicable in United States federal courts for the recognition of state court judgments is the institution of a plenary action, on notice, with appropriate service of process.

Most importantly, Plaintiffs' *ex parte* Petition in DC was denied on this very basis.   In effect Plaintiffs forum shopped when filing their NY Petition with this Court.

For these reasons, this Court should (a) vacate the April 21 Order and Judgment and April 28 Order and Judgment, (b) reject any further attempts by Plaintiffs to bring an enforcement action in this Court or any other court in the United States ,(c) stay any and all enforcement proceedings pending this Motion, and (d) in the event that this Court denies this

Motion, stay any enforcement action of the April 21 Order and Judgment and April 28 Order and Judgment until a decision is issued in the appeal in the Tribunal.

Romania specifically reserves all of its rights and does not waive any of its defenses or its sovereign immunity.

Dated: May 19, 2015

Respectfully submitted,

THE GOVERNMENT OF ROMANIA

By:____/s/ Ioana Salajanu_____
        Ioana Salajanu


Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
Telephone: (312) 494-1000
Facsimile: (312) 494-1001
isalajanu@rfclaw.com

*Attorneys for Defendant Government of Romania*