**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of the Application of<br><br>IOAN MICULA, *et al.,*<br><br>              Petitioners,<br><br>VIOREL MICULA,<br><br>              Intervenor,<br><br>For Recognition and Enforcement of an Arbitration Award<br><br>         - against -<br><br>THE GOVERNMENT OF ROMANIA,<br><br>            Respondent. | Case No.1:15-mc-00107-P1 |

**MEMORANDUM OF LAW IN SUPPORT OF CLAIMANTS' OPPOSITION TO ROMANIA AND DEPOSITORY TRUST COMPANY'S MOTIONS TO VACATE RESTRAINING NOTICE**

Paula H. Anderson
Danforth Newcomb
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848 7727
Facsimile: (212) 646 7727
paula.anderson@shearman.com
dnewcomb@shearman.com

*Counsel for Intervenor Viorel Micula*

Francis A. Vasquez, Jr.
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone: (202) 626 3600
Facsimile: (202) 639 9355
fvasquez@whitecase.com

Jacqueline L. Chung
Anna K. Diehn
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
Telephone: (212) 819 8200
Facsimile: (212) 354 8113
jacqueline.chung@whitecase.com
anna.diehn@whitecase.com

*Counsel for Petitioners Ioan Micula,*
*S.C. European Food S.A., S.C. Starmill*
*S.R.L. and S.C. Multipack S.R.L.*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT .......................................................................................................................5

    I.   The Restraint Is Valid Because Romania Retains an Interest in the Funds
        Deposited at DTC .............................................................................................5

    II.  The Restraining Notice Should Apply To Funds that Romania Will Deposit at
        DTC on January 22, 2016 And For The Remainder of the Year ................................12

    III. Romania's Pending Motion for Satisfaction of the Judgment Does Not Justify
        Lifting the Restraint ..........................................................................................14

    IV. The Restraining Notice Does Not Bypass Applicable Procedural Requirements .......15

    V.  Romania Should be Required to Post a Bond if the Restraint is Lifted......................15

CONCLUSION....................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*ABKCO Indus., Inc. v. Apple Films, Inc.*,
  39 N.Y.2d 670 (1976) .............................................................................13

*Altria Grp., Inc. v. United States*,
  694 F. Supp. 2d 259 (S.D.N.Y. 2010) aff'd, 658 F.3d 276 (2d Cir. 2011)................10

*In re Amdura Corp.*,
  75 F.3d 1447 (10th Cir. 1996) ....................................................................9

*Am. Fed. Grp., Ltd. v. Rothenberg*,
  No. 91-civ-7860, 1998 WL 273034 (S.D.N.Y. May 28, 1998).............................6, 13

*In re Appraisal of Dell Inc.*,
  C.A. No. 9322-VCL, 2015 WL 4313206 (Del. Ch. July 13, 2015)............................8

*Bass v. Bass*,
  140 A.D.2d 251 (1ˢᵗ Dep't 1988).................................................................6

*Capital Ventures Int'l v. Republic of Argentina*,
  280 Fed. App'x 14 (2d Cir. 2008).................................................................6

*CIMC Raffles Offshore (Singapore) Ltd.* v. *Schahin Holding S.A.*,
  942 F. Supp. 2d 425 (S.D.N.Y. 2013).........................................................6, 12

*EM Ltd.* v. *Republic of Argentina*,
  389 Fed. App'x 38 (2d Cir. 2010)................................................................6

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 476 (2d Cir. 2007)......................................................................6

*Gallant et al., v. Kantermann et al.*,
  198 A.D.2d 76 (1993). ...........................................................................14

*Gauthier v. Mardi Capital Corp.*,
  No. 90 Civ. 4313(CSH), 1990 WL 250179 (S.D.N.Y. Dec. 26, 1990) ....................16

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  313 F.3d 70 (2d Cir. 2002)......................................................................13

*Matter of Niagara Mohawk Power Corp. (Iocovozzi),*
   127 Misc.2d 178 (Sup. Ct. Albany 1985) ................................................................14

*Matter of Southmark Corp.,*
   49 F.3d 1111 (5th Cir. 1995) ..................................................................................11

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010)..................................................................................................8

*NML Capital, Ltd. v. Republic of Argentina,*
   727 F.3d 230 (2d Cir. 2013)...............................................................................7, 11

*NML Capital, Ltd., v. Republic of Argentina,*
   No 1:08-cv-06978-TPG ..........................................................................................11

*In re Petrobras Sec. Litig.,*
   No. 14-cv-9662, 2015 WL 9266983 (S.D.N.Y. Dec. 20, 2015)................................8

*Ray v. Jama Prods., Inc.,*
   74 A.D.2d 845 (2d Dept. 1980) ..............................................................................14

*Verizon New England Inc. v. Transcom Enhanced Servs., Inc.,*
   98 A.D.3d 203 (2012) .............................................................................................13

*Walter v. Doe,*
   402 N.Y.S.2d 723 (Civ. Ct. 1978) ..........................................................................14

## STATUTES AND RULES

22 U.S.C.A. § 1650a ......................................................................................................3

CPLR § 5222 ......................................................................................................... passim

UCC § 8-503 ................................................................................................................10

UCC § 8-505 ................................................................................................................10

AMERICAS 91033131

Petitioners Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. and Intervenor Viorel Micula (collectively, "Claimants"), hereby submit this collective opposition to Romania and the Depository Trust Company's ("DTC") motions to vacate the restraining notice served on DTC.

## INTRODUCTION

Romania owes Claimants upwards of $116 million plus interest as the result of an arbitral award issued by the International Centre for the Settlement of Investment Disputes ("ICSID") over two years ago, after eight years of protracted proceedings.[1]   This Court recognized the award and entered a judgment for the full amount of the award in April 2015.   Since then, Romania has made no attempt to pay either the award itself or the judgment and has also refused to provide post-judgment discovery, notwithstanding this Court's granting of a motion to compel such discovery.   Romania's motion to vacate the judgment was denied on August 5, 2015; its motion to stay enforcement was also denied on that date because Romania failed to post a bond. That decision is now on appeal to the Second Circuit.

Severely prejudiced by Romania's delays and evasions, Claimants have undertaken their own efforts to identify attachable assets of Romania in this jurisdiction.   Claimants identified several payments on Romanian-issued bonds that Romania is due to pay into DTC this year – the first of which are due on January 22, 2016.   Claimants have served a restraining notice on DTC to ensure that the funds that Romania has deposited into DTC will remain available for subsequent attachment and execution in satisfaction of the judgment.

---

[1] Calculated as of December 11, 2013, the date that the ICSID award was issued.

Romania – now aided by DTC – attempts once again to evade its obligations to satisfy the judgment by challenging the validity of the restraining notice.  As discussed below, however, the restraint, served pursuant to New York Civil Practice Law and Procedure ("CPLR") § 5222, is proper and Romania and DTC have no basis to challenge the restraining notice.

Romania and DTC assert that the payments made by Romania into DTC cannot be restrained because those funds belong to, or are legally owned, by DTC at the moment they are deposited.  They argue that DTC is legally entitled to the payments because DTC, as a depository institution, holds legal title to the securities.  That argument is a fallacy, however, because DTC holds legal title to the securities for purely ministerial purposes (to facilitate the fast and effective transfer of securities without the transfer of paper certificates) and no authority conveys DTC "ownership" of the payments, which Romania deposits at DTC only so that DTC may allocate these funds pro-rata to bondholders.  DTC has no independent claim to the funds and does not have any rights to the funds; its only role is to serve the issuer and DTC participants by facilitating the transfer and allocation of bond payments.  DTC's own Operating Arrangements attest to this, and DTC does not contest either their applicability or validity.

Nor do the other arguments advanced by Romania and DTC hold water.  The restraint should apply even if DTC will not receive any of the funds at issue until January 22 because DTC has already conceded that it will be in possession of these funds, and it is obvious that Claimants are not exploiting the restraining notice requirements under CPLR § 5222 by "fishing" for attachable assets.  Additionally, the restraint should not be lifted as a result of Romania's pending motion for judgment satisfaction – which is baseless – or because of Romania's assertion that a plenary action is required before a judgment creditor can even restrain assets pursuant to a judgment.

Finally, Claimants note that although Romania and DTC's argument that the restraint will cause significant disruption to the securities market and financial industry is a red herring – the obvious solution to their purported dilemma is to have Romania post a bond equal to the amount of the funds that it has deposited at DTC, in exchange for a lifting of the restraint.

## BACKGROUND

Petitioners hold a judgment against The Government of Romania ("Romania") for the amount of 376,433,229 Romanian Leu ("RON") plus interest.  This judgment, which was entered in this jurisdiction on April 28, 2015, recognizes an arbitral award issued on December 11, 2013 in Petitioners' favor against Romania by ICSID (the "Award"),[2] pursuant to the requirements of 22 U.S.C.A. § 1650a, the ICSID enabling statute.  To this date, the judgment remains unpaid.

Romania has also refused to respond to Petitioners' post-judgment discovery requests, which were issued on May 12, 2005 and continues to frustrate Petitioners' efforts to obtain the necessary discovery that would identify relevant attachable assets, including bank accounts, securities investments, real property, and exports/imports.

On December 18, 2015, Petitioners, judgment creditors of Romania, served a restraining notice on DTC, a nonparty in this action, with the understanding that Romania would make certain bi-annual interest payments on Romanian-issued bonds through DTC on January 22, 2016 and multiple other dates thereafter.  Restraining Notice, Declaration of J. Faith in Support of Motion to Vacate (January 19, 2016) ("Faith Decl.") Ex. 1.  Petitioners also served notice of the restraint on Romania.

Counsel for Petitioners and DTC first conferred on January 4, 2016 regarding the restraining notice.  Counsel for Petitioners requested additional information about the bonds, but

---

[2] ICSID Case No. ARB/05/20.

AMERICAS 91033131

was informed that such information would only be provided pursuant to a subpoena.  On January 7, 2016, DTC sent a letter to Petitioners explaining DTC's objections to the restraint. Declaration of Eric P. Heichel in Support of Motion to Vacate (January 18, 2016) ("Heichel Decl.") Ex. 3. Petitioners responded via e-mail on January 11, 2016, and then served DTC with a subpoena requesting that DTC produce documents relating to the bond payments at issue in the Restraining Notice.   Specifically, Petitioners requested all documents, communications, contracts, and agreements between DTC and Romania, Romania's paying agent and DTC's Participants regarding the bonds at issue.  DTC has not yet provided Petitioners with the documents requested in the subpoena.

Romania, despite having been served notice of the restraint on December 21, 2016, waited until January 16, 2016 to file a letter motion requesting an order to show cause as to why restraint should not be lifted.  Subsequently, Petitioners filed a letter response explaining its position on why the restraint was valid and should remain in place.  Following a conference with this Court on January 19, 2016, DTC submitted its own papers requesting an order to show cause on its motion to vacate the restraining notice.  The Court ordered that Petitioners submit their response by no later than January 20, 2016 at 3:00 pm.  Following that conference, Romania did not actually serve its motion papers until after 11 pm. [3]

---

[3] Needless to say, although counsel for DTC has apologized to the Court for the urgency of the situation and the need for the Court to resolve this issue on such an expedited basis, Claimants note that their restraining notice was served over a month ago and Romania and DTC had ample opportunity to notify the Court of their objections to the restraint.  By waiting until the last minute to move to vacate the restraining notice, Romania and DTC have unfairly prejudiced Claimants by giving them an exceedingly limited time to respond to Romania and DTC's briefing (i.e.,  less than 24 hours to oppose to Romania and DTC's motions to vacate the restraining notice).  Given they have not received any responses to discovery from either Romania or DTC, Claimants reserve the right to raise additional arguments in support of the restraint and attachment of the assets identified in the restraining notice, as necessary, in subsequent stages of these enforcement proceedings.

4

## ARGUMENT

I.    **The Restraint Is Valid Because Romania Retains an Interest in the Funds Deposited at DTC**

CPLR § 5222 provides that a party seeking to enforce a judgment may seek to restrain or prohibit the transfer of a judgment debtor's property in the hands of a third party if that third party "is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest."  CPLR § 5222.  All such property or debt which thereafter comes into the possession or custody of such person is subject to the restraining notice.  *See id.*  The restraining notice remains valid against the restrained party for up to a year after service or until the judgment has been satisfied.  *See id.*  Because Claimants have satisfied the requirements of CPLR § 5222, the restraining notice is valid and should not be lifted.

Romania is the only entity that retains an interest in the funds at the time they are deposited at DTC.  The funds are owned by Romania, disbursed by Romania, and directed to DTC in preparation for paying holders of Romanian-issued bonds.   The Information Memorandum under which the Romanian bonds were issued provides that DTC will credit the accounts of its Participants on the interest payment date "unless DTC has reason to believe that it will not receive payment on the due date," thereby indicating that the payment process is entirely dependent on the arrival of funds belonging to the issuer.  Information Memorandum, Faith Decl. Ex. 2, at 192.  Romania may also bypass DTC and pay the bondholders directly in the context of foreign currency transactions. *Id.* DTC's Operational Arrangements, which, among other things, outline the procedures for interest income payments made by issuers, also provide that that the funds deposited at DTC may be refunded to the issuer in certain situations, including in the event of an error.  Operational Arrangements, Declaration of Francis A. Vasquez, Jr. (January 20,

5

2016) ("Vasquez Decl.") Ex. A, at 22.  These factors all evidence the fact that Romania remains some degree of control of the funds that it deposits at DTC and thus, retains an interest in them. *See, e.g.*, *EM Ltd.* v. *Republic of Argentina*, 389 Fed. App'x 38, 41-42 (2d Cir. 2010) (permitting attachment to remain where judgment debtor retained "discretionary use" over the disbursement to the funds and "current authority to direct disposition of the corpus of the . . . [t]rust for its own benefit[.]"); *CIMC Raffles Offshore (Singapore) Ltd.* v. *Schahin Holding S.A.*, 942 F. Supp. 2d 425, 429 (S.D.N.Y. 2013) (permitting restraint of judgment debtor's payments to unsecured third-party lender as reimbursement of operating payments).[4]

DTC has no independent claim to the funds that are deposited in its account and does not retain those funds, but either transfers them to third parties or returns them to Romania in accordance with the Operational Arrangements.  Operational Arrangements, Vasquez Decl. Ex. A, at 19-22.  DTC simply performs the ministerial task of processing bond interest payments that Romania deposits.  To facilitate this process, DTC requires "all income payments . . . [to] be made in same-day funds via Fedwire to DTC's Dividend Deposit Account."  *Id.* at 20.  Issuers must transmit their payments to DTC by a certain hour on the payment date.  *Id.*  Issuers or their paying agents must also provide CUSIP-related payment information so that DTC knows how to allocate and direct the payments onward.  *Id.*  The purpose of the Restraining Notice is to halt the

---

[4] The authorities upon which Romania and DTC rely in support of their argument that Romania does not retain an interest in the funds are irrelevant.  None of the remote "interests" at issue in these cases is similar to the interest that Romania has here in its own funds. *See, e.g.*, *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dep't 1988) (judgment debtor did not have interest in daughter's home even though he provided a loan for its purchase); *Am. Fed. Grp., Ltd. v. Rothenberg*, No. 91-civ-7860, 1998 WL 273034, at *9 (S.D.N.Y. May 28, 1998) (holding that a creditor could not attach a letter of credit purchased by a debtor); *Capital Ventures Int'l v. Republic of Argentina*, 280 Fed. App'x 14, 15 (2d Cir. 2008) (denying creditors' attempts to seize excess collateral held by judgment debtor because judgment debtor was contractually precluded from securing the release of any excess collateral); *EM Ltd. v. Republic of Argentina*, 473 F.3d 476, 487 n.13 (2d Cir. 2007) (noting that Argentina's influence over its central bank did not translate into an assignable interest by Argentina in funds held in the bank).

6

transmission of the Romanian deposits when they reach DTC, and before DTC begins the process of transferring the funds to other accounts.

As is evident from the above-description and as DTC itself explains in its published Operational Arrangements, its "services . . . are *ministerial* in nature," meaning, in common terms, that it is "acting or active as an agent." *Id.* at ii (emphasis added); Merriam-Webster's Collegiate Dictionary 741 (10th ed. 1996). Indeed, DTC has affirmatively acknowledged this role in the payment process as such in letters submitted to this court and the Second Circuit Court of Appeals in *NML Capital, Ltd. v. Republic of Argentina*. There, with regard to the principal and interest payments ("P&I") payments at issue, DTC stated:

> DTC takes [the paying agent's] instructions and the P&I allocation process is essentially a *ministerial* act. Allocations of cash settlements are made by DTC on the same basis as transfers of securities, i.e., only at the Participant level. Allocations made by DTC are only to the Participants who have deposited the respective securities with DTC. It is up to the various Participants to then transfer funds to the proper beneficial owners, as appropriate, who are customers.

E. Heichel Letter to Judge Thomas Griesa dated November 12, 2012, Vasquez Decl. Ex. B (emphasis added). Based on this letter, the Second Circuit rejected the claim that DTC was an "intermediary bank", because it merely accepted funds from the sovereign judgment debtor/issuer and allocated them; thus, the restraint on DTC was upheld. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 245 (2d Cir. 2013). DTC's Operational Arrangements describe the "securities services" that it provides to Issuers and their Agents, including the handling of securities transfers and income payments. It is apparent from the face of the DTC's Operational Arrangements and DTC's own statements about its role in the bond payment system that there is an agency relationship between Romania and DTC, such that DTC acts at the behest of Romania to process the bond payments deposited into the DTC account.

7

Notably, in a recent opinion issued by this Court in *In re Petrobras Securities Litigation*, Judge Rakoff concluded that book entry transactions at DTC were not legally meaningful transactions.  *In re Petrobras Sec. Litig.,* No.  14-cv-9662, 2015 WL 9266983, at *4 (S.D.N.Y. Dec. 20, 2015).   Regarding the issue of whether a securities transaction satisfied the requirements for jurisdiction under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), Judge Rakoff noted that the Second Circuit had held that "actions needed to carry out . . . transactions, and not the transactions themselves[,]" were not sufficient to invoke jurisdiction and concluded that "mechanics of DTC settlement" were simply that: "actions needed to carry out transactions".  *Id.* (*citing Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d. Cir. 2014)). That same conclusion can be applied here with regard to the payment transactions at issue: DTC's role in the process is not legally meaningful because it is simply enabling those to whom it provides services – Issuers and Participants – to conduct a transaction.

Romania and DTC assert that because DTC is the "registered holder and legal owner of the securities deposited by its Participants," it must also be the legal owner of the bond payments that issuers pay to bondholders through DTC.  Romania Motion at 3-5; DTC Motion at 7-9.  That argument is contradicted by the facts.  To understand why DTC's misinterprets its position here, it is necessary to unpack *why* DTC came into being and the role it plays in the financial system. As stated in authority cited by DTC itself, DTC emerged as part of a federal response to a "paperwork crisis" on Wall Street during the 1960s and 70s that resulted from dramatically increased securities trading.  *See In re Appraisal of Dell Inc.*, Consol. C.A. No. 9322-VCL, 2015 WL 4313206, at *1 (Del. Ch. July 13, 2015).   Back offices of brokerage houses were overwhelmed with the task of documenting stock trades using paper certificates.  *Id.* at *1.  In an effort to alleviate the administrative burdens on brokerage firms, SEC adopted a national policy

8

of "share immobilization" and created DTC as a depository institution to hold the securities of its participating members.  *Id*.  With share immobilization, legal title to securities remained with Cede & Co., the nominee of DTC, at all times and the transfer of beneficial ownership of securities was tracked through an electronic book entry system – thus obviating the need for any physical transfer of stock certificates.  Thus, DTC's purpose from the beginning has been to perform a back office function – a menial or ministerial function – to ensure timely and efficient securities transfers.  *See id. at* *5 (noting SEC's finding that "'registering securities in other than the name of the beneficial owner' was essential to establishing 'a national system for the prompt and accurate clearance and settlement of securities transactions.'").  It is apparent from this history that DTC's role as a "legal owner" of securities is a formality that has been built into the financial system to enable quick and efficient trading in the securities markets.  Nowhere in this system did the SEC or other governing authorities confer any additional rights and authorities on DTC, including the right to claim "ownership" of funds paid to the beneficial owners of securities through DTC.

DTC also does not demonstrate any indicia of ownership with regard to the funds deposited at DTC by Romania.  First, DTC cannot demonstrate ownership when its only function is to apportion the funds, which arrive at DTC in lump sum, as part of the process of ensuring that each bondholder receives its pro-rata share of the interest payment.  Second, DTC is exceedingly limited with regard to what it can do with the funds when they arrive, thus indicating that DTC does not enjoy the benefits or legal rights of "ownership".  DTC must allocate these funds pursuant to the agreements by and between the issuer, DTC, and DTC Participants; it is not free to assign or transfer these funds at will.  *See In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) (noting that in addition to holding an funds in an account in its

name, entity had "other legally cognizable indicia of ownership" including "the right to spend the money entirely as it saw fit without concern for 'whose money' it was spending[.]")  Third, DTC does not bear the obligations of ownership, including the obligation to pay taxes on dividends, as would normally be the case for a party collecting interest payments for its own benefit.  *See, e.g., Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 265 (S.D.N.Y. 2010) aff'd, 658 F.3d 276 (2d Cir. 2011) (noting that "lessees assumed significantly all of the traditional benefits and burdens of ownership, including the obligation to pay property taxes, insurance, maintenance, and regulatory costs.").  The absence of any indicia of ownership demonstrates that DTC's "ownership" claims are unfounded.

UCC Section 8-505 provides no additional basis to support DTC's claim to legal ownership of the bond interest payments.  Section 8-505 specifies only the obligations that "securities intermediaries" such as DTC have toward their securities holders (i.e., to pass through to these holders the benefits of ownership of the financial asset), but does not articulate any ownership or property rights that the *securities intermediary* has with regard to the assets.  In fact, UCC Section 8-503 makes it apparent that DTC's ownership claims are thin, because the provision states with regard to "securities intermediaries," that:

> (a) To the extent necessary for a securities intermediary to satisfy all security entitlements with respect to a particular financial asset, all interests in that financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders, *are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary, except as otherwise provided in Section 8-511.*

The fact that the UCC specifically disclaims the securities intermediary's ownership of the assets held by it – and further states that creditors of the securities intermediary are not entitled to make claims against the assets held by the securities intermediary (as a judgment creditor normally would be able to make a claim against property owned by the judgment debtor) – demonstrates

10

that not even the UCC contemplates that securities intermediaries such as DTC should retain a property interest in the assets it transmits from the securities issuer to the securities holder.  *See Matter of Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995) (stating that a "primary consideration in determining if funds a *property* of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment.")

Further, the type of restraint requested by Claimants is grounded on solid precedent.  This Court and the Second Circuit have previously approved of the restraint of sovereign assets at DTC.  In *NML v. Republic of Argentina*, Judge Griesa issued a preliminary injunction that prohibited Argentina, agents of Argentina, and parties acting "in active concert or participation" with Argentina from transmitting bond payments to holders of Exchange Bonds without making a ratable payment to plaintiff, NML.  *NML Capital, Ltd., v. Republic of Argentina,* No 1:08-cv-06978-TPG, ¶¶ 2(e),(f) (S.D.N.Y. Nov. 21, 2012) (ECF No. 425).  This preliminary injunction also applied to DTC, who acted as a clearing agent for the Argentinian bond payments.  The Second Circuit affirmed this injunction on appeal.  *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 244 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2819 (U.S. June 16, 2014) (No. 13-991).  There is no reason why the Court should not similarly restrain Romania's deposits at DTC as they accumulate at DTC for processing in accordance with DTC's Operating Arrangements.  Although DTC attempts to draw distinctions between the holding in the NML cases and the present case, those distinctions are inconsequential; the most important conclusion in NML was that there could be a legal basis to restrain assets at DTC.

Finally, DTC's fear-mongering about the purported catastrophe that such a restraint would cause to the securities markets and larger financial system should not be credited.  First, as

11

is obvious from the notice of restraint, the restraint only concerns one issuer and a limited number of bonds; it does not have any impact on any other issuers or bonds.  Restraining Notice, Faith Decl. Ex. 1.   Second, as noted above, sovereign bond payments directed at DTC have been enjoined before in the *NML* cases, notwithstanding DTC's prior threats of disruption to the financial system.  Moreover, DTC's own Operational Arrangements contemplate that there may be instances where funds deposited at DTC may need to be returned to the issuer or a paying agent either because of the issuer's default or due to processing errors. Operational Arrangements, Vasquez Decl. Ex. 1, at 22. Additionally, the Information Memorandum issued by Romania, and cited by DTC provides for instances where Romania may bypass the depository institution entirely and make a payment directly to the bondholder, thereby discrediting the idea that DTC's role is vital to the bond payment process.  *See* DTC Motion Exhibit 2 at 192.  All of these factors demonstrate that while DTC may prefer not to halt the payment stream from the issuer to the bondholder, it can definitely do so – and has provided for this possibility – without causing irreparable damage to the financial system. Moreover, any claim that Plaintiff's restraint of the funds would cause disruption for Romania's bondholders is offset by Plaintiff's rights to recover on its judgment.  *See CIMC Raffles Offshore (Singapore) Ltd.*, 942 F. Supp. 2d at 431 ("It is too unlikely that the parade of horribles put forth by [third-party bank] will occur to justify preventing [judgment creditor] from obtaining satisfaction on a judgment that it has rightfully obtained.").

## II.     The Restraining Notice Should Apply To Funds that Romania Will Deposit at DTC on January 22, 2016 And For The Remainder of the Year

DTC's argument—that the restraining notice is invalid because DTC was not in possession of Romania's property at the time of service of the Restraining Notice—should be rejected.

AMERICAS 91033131

First, CPLR § 5222 specifically provides that "[a]ll property in which the judgment debtor or obligor is known or believed to have an interest then in and *thereafter coming into* the possession or custody of such a person" is subject to the restraining notice. CPLR 5222(b) (emphasis added). Moreover, a restraint served under CPLR § 5222 is valid for up to one year after it is served or until the judgment is satisfied or vacated, whichever event occurs first. *Id.* Section 5201 broadly defines the type of property against which a money judgment may be enforced: "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested." *See Am. Fed. Grp., Ltd. v. Rothenberg*, No. 91-civ-7860 (THK)(SWK), 1998 WL 273034, at *8 (S.D.N.Y. May 28, 1998). Here, Petitioners seek to restrain property specifically provided for in the statute.

Second, courts have upheld restraining notices seeking to attach future payments or transfers, like Petitioners seek to do here. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 85-88 (2d Cir. 2002) (holding, in relevant part, that a future property interest was subject to attachment by a judgment creditor);[5] *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675-76 (1976) (holding that debtor's interest in film licensing agreement, which granted debtor a percentage of future profits, was property that could be attached by creditor); *compare with Verizon New England Inc. v. Transcom Enhanced Servs., Inc.*, 98 A.D.3d 203, 209 (2012) (finding that contract was not

---

[5] In this case, the plaintiff obtained a $111.1 million arbitral award against Pertamina. In seeking to enforce the judgment, the plaintiff issued restraining notices on Bank of America, where Pertamina held multiple trust accounts. The district court concluded that ownership of all funds, except for a future property interest of 5% of Net Operating Income (the "Retention"), was vested in the Republic of Indonesia, not Pertamina, and was thus unattachable. However, the district court also held, and the appellate court affirmed, that the future "Retention" was within Pertamina's control, and therefore subject to attachment by plaintiff. These funds were allowed to accumulate until they could satisfy the judgment.

subject to attachment where it was "contingent upon some uncertain future act of performance by the parties" and did not "obligate the other party to pay the judgment debtor.").[6]

If the court vacates the Restraining Notice on this basis, Petitioners—who have a valid judgment and have identified attachable property despite Romania's best efforts to thwart collection—would essentially be required to re-serve the restraining notice at the exact minute the funds are transferred to DTC.  Such a strained application of § 5222 only allows Romania to continue to evade payment of the valid Judgment obtained by Petitioners.  As discussed above, DTC has already conceded that it will receive the funds on January 22, 2016.  This is not the case of a judgment creditor serving restraining notices at whim or engaging in a fishing expedition, which is what § 5222 was intended to prevent.  *See Walter v. Doe*, 402 N.Y.S.2d 723 (Civ. Ct. 1978).[7]

### III.  Romania's Pending Motion for Satisfaction of the Judgment Does Not Justify Lifting the Restraint

Romania's claim that the judgment has been satisfied is completely devoid of factual or legal support, and does not justify lifting a valid restraint.  In fact, the real purpose of Romania's motion is simply to further delay compliance with an order to compel discovery that was rendered by this court on December 3, 2015, and Romania's arguments are duplicates of those made in its motion to vacate the judgment, which was rejected on August 5, 2015, and is now on appeal.  While Claimants will submit further briefing in support of their opposition to Romania's

---

[6] See also *Matter of Niagara Mohawk Power Corp. (Iocovozzi)*, 127 Misc.2d 178 (Sup. Ct. Albany 1985) (upholding restraining notice enjoining return of the judgment debtor's security deposit at some future, uncertain time); *Ray v. Jama Prods., Inc.,* 74 A.D.2d 845 (2d Dept. 1980).

[7] Further, the words "at the time of the service of the notice" were included in § 5222 to prevent a judgment creditor from "holding a party other than a judgment debtor indefinitely liable for violation of a restraining notice."  *Gallant et al., v. Kantermann et al.*, 198 A.D.2d 76, 78 (1993). Here, the Restraining Notice is very specific in limiting DTC's liability.

AMERICAS 91033131

pending motion for judgment satisfaction, Claimants note in short that (1) Romania's claim to have satisfied the award using tax setoffs has been specifically litigated and rejected by Romanian courts and (2) as Romania itself admits as undisputed fact, Claimants have never actually received *any* of the funds that Romania purports to have paid into a specially-designated account in order to satisfy the Award.  *See* ECF Nos. 51, at 7-8; 52-6; 100-1, at ¶ 21.  The restraint should not be lifted when the judgment has not been paid in fact.  At a minimum, the restraint should remain in place while the motion for judgment satisfaction is pending

### IV.   The Restraining Notice Does Not Bypass Applicable Procedural Requirements

Romania's recycled arguments regarding the plenary action requirement provides no basis to lift the restraint.  This Court has already rejected Romania's request for a plenary action and Romania cites to no authority requiring Claimants to begin such an action before serving a restraining notice in connection with a judgment already entered by this Court.  *See* ECF No. 66 at 5.  Indeed, the service of a restraining notice on its own is not a separate "enforcement proceeding," but simply a precautionary measure to ensure that assets of the judgment debtor remain available for eventual attachment and execution proceedings.  Moreover, there is no requirement under CPLR § 5222 that judgment creditors initiate a plenary action before serving a restraining notice.  The most important procedural requirement for restraints is the existence of a judgment that has been unsatisfied – and that requirement has been met here.

### V.   Romania Should be Required to Post a Bond if the Restraint is Lifted

This is not the first time that Romania has sought to delay or evade satisfaction of the judgment without posting a supersedeas bond.  *See* ECF Nos. 66 at 8-9; 92, 95.  Because Romania once again seeks to prolong the judgment satisfaction process, it is only reasonable that Romania be required to post a bond that is equal or greater than the amount of the money to be deposited at DTC in the event that the Court lifts the restraint.  Indeed, the posting of a bond in

lieu of the restraint would alleviate many of the purported concerns raised by Romania and DTC regarding the effect of the restraint on the securities marketplace.   Thus, it would be those parties' interest for Romania to post a bond.   *Gauthier v. Mardi Capital Corp.*, No. 90 Civ. 4313(CSH), 1990 WL 250179, at *1 (S.D.N.Y. Dec. 26, 1990) ("The whole purpose of a supersedeas bond is to secure the appellee's claim while liberating appellant's property from enforcement of the judgment. There is ample authority for vacatur of a previously obtained restraint upon the filing of an appropriate supersedeas bond").

16

## CONCLUSION

The Restraining Notice complies with the requirements of CPLR § 5222 in that it requires DTC, as a garnishee, to restrain funds over which Romania has an interest and that are in DTC's possession.  Accordingly, the Restraining Notice is valid and Romania's request to lift the restraint should be denied.

Dated: New York, New York
       January 20, 2016

Respectfully submitted,

WHITE & CASE LLP

/s/ Francis A. Vasquez, Jr.
Francis A. Vasquez, Jr.
701 Thirteenth Street, N.W.
Washington, DC  20005

-and-

Jacqueline L. Chung
Anna K. Diehn
1155 Avenue of the Americas
New York, NY  10036

*Counsel for Petitioners Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L.*

SHEARMAN & STERLING LLP

/s/ Danforth Newcomb
Paula H. Anderson
Danforth Newcomb
599 Lexington Avenue
New York, NY 10022-6069

*Counsel for Intervenor Viorel Micula*

17